UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NO.  9:05-CR-42 |
| v. : | |
| : | JUDGE RON CLARK |
| CHRISTOPHER SHANE MILIKAN : | |
| : | |

**MEMORANDUM OPINION AND ORDER ON MOTION TO SUPPRESS**

**INTRODUCTION**

Acting on a tip, Lieutenant Anthony Lowrie, Sergeant Howard Smith, and Deputy Martin Dubose went to the motel room at which Defendant Christopher Milikan was staying with co-defendants Kerrie Arnett and John Benge.  The officers knocked on the door and  Ms. Arnett answered.  When Sgt. Smith said "sheriff's department"  Arnett tried to leave, but was prevented from doing so by Lt. Lowrie.

The officers saw a case, which they describe as a gun case, and saw  Milikan pick up what appeared to be a glass  pipe, drop it, and kick it under the bed.  Benge came out of the bathroom and immediately turned to go back in.  The officers entered the room, placed Milikan and Benge in handcuffs, and conducted a brief protective sweep of the room, the bathroom, and the adjoining room.  Lt. Lowrie then talked with Arnette outside and obtained verbal and written consent to search the room.

1

Milikan moved to suppress various statements and items of evidence found as a result of the search. Because the officers questioned Milikan after he was in custody, without giving him any Miranda warning, the motion is granted as to Milikan's statements that he had, in his pockets, methamphetamine and the key to the case in which a rifle was found. The Government did not meet its burden of establishing an exception to the requirement to obtain a warrant before opening the locked case. Therefore evidence of the rifle must be suppressed, especially in view of the fact that the key to the case was obtained from Milikan as the result of questioning without a Miranda warning. The drugs, drug paraphernalia, receipts, and counterfeit currency found in the room were obtained as a result of Arnett's consent to search and will not be suppressed. Milikan's videotaped statement and written statement were given after he was properly informed of his rights and will not be suppressed.

## ANALYSIS

The analysis of Defendant's motion as to the bulk of the evidence, found pursuant to Arnett's consent to search, is based on long established precedent and was set out by the court on the record at the hearing.[1] However, certain issues, especially whether the officers violated Defendant's rights by entering the room in the first place, justify further exposition.

### Was Warrantless, Non-consensual Entry Justified?

The first issue is whether the officers violated Milikan's rights by entering the room without a warrant. Lt. Lowrie credibly testified that he received a tip that a woman and two men were in the hotel room with drugs, counterfeit currency, stolen weapons, and that one of them was acting "very

---

[1] The court stated its findings of fact in detail at the hearing. Only those facts necessary for an understanding of the issues considered in this memorandum will be repeated.

strange, like as if he was already high on something." The informant's reliability was not such that a warrant could be obtained on the tip alone, so Lt. Lowrie decided to conduct a "knock and talk."

This procedure, in which an officer knocks on a person's door and asks to speak with them, and to enter the residence has been approved, so long as it is not used as a means of avoiding the need to obtain a warrant. *United States v. Jones*, 239 F.3d 716, 721 (5th Cir. 2001) . As in *Jones*, the officers did not know that criminal activity was occurring. While they had been told that the inhabitants of the room had stolen weapons, the officers did not act as though they believed there was a serious possibility of danger.

They walked up to the door, grouped together, without body armor, with weapons holstered, and without backup. One might argue that this was not the safest approach, given the tip they had received, but the court must rule on the constitutionality of their conduct, not on the tactical soundness of their approach. The court finds the officers' stated reasons for going to the room to conduct a "knock and talk" credible. The court does not find that the officers actually believed that armed drug dealers awaited them and chose to offer themselves up as targets rather than obtain a warrant.

When Arnett opened the door, the officers saw a case, which they thought was a gun case. Benge was coming out of the bathroom and immediately turned back into it. The officers entered the room and secured Benge and Milikan. They then conducted a brief inspection for other occupants who might pose a danger - what is known as a "protective sweep."

The reasonableness of their decision to enter and "sweep" requires a balancing of the intrusion on Milikan's Fourth Amendment interests against the promotion of legitimate government

interests. *Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 1096 (1990).[2] At the very heart of the Fourth Amendment is the protection against physical entry of a person's residence. *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379 (1979).[3]

So important is the protection of the Fourth Amendment that a warrantless entry and search "is *per se* unreasonable, unless the government can demonstrate that it falls within one of a carefully defined set of exceptions to the Fourth Amendment's warrant requirement." *United States v. Vega*, 221 F.3d 789, 798 (5th Cir. 2000). These exceptions recognize narrowly drawn circumstances in which a legitimate government interest may outweigh the intrusion on personal privacy in the home.

"Exigent circumstances," which cannot have been created by the officers' actions, is one such exception. *See Jones*, 239 F.3d at 719-20. Of the various factors set out in *Jones*, to assess whether exigent circumstances exist, two seem determinative in this case. There was a clear possibility of danger to the officers. They had a tip that weapons were in the room, which had been confirmed by the case which appeared to be of a type which might hold firearms.[4] Benge was retreating to the bathroom, a location from which he might easily be retrieving a weapon. At that moment, the

---

[2]The Government agreed that, as an authorized overnight guest of Arnett, who rented the room, Milikan is entitled to the same Fourth Amendment protection in the room as he would have in his house. *See Minnesota v. Olson*, 495 U.S. 91, 98-99, 110 S.Ct. 1684, 1688-89 (1990).

[3]"The point of the Fourth Amendment . . . is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." 445 U.S. at 586, 100 S.Ct. at 1380 n.24 (quoting *Johnson v. United States*, 333 U.S. 10, 13-14, 68 S.Ct. 367, 369 (1948)

[4]Of course the presence of a firearm, by itself does not create an exigent circumstance, if there is no reason to believe the suspect is aware of police surveillance. *Jones*, 239 F.3d at 720. In this case the occupants obviously knew the officers were there.

officers had no time to reflect, retreat and seek a warrant, or stand at the door asking for consent to enter.

The court is not going to hold that these officers, in a situation which reasonably might be expected to erupt into sudden gunfire, violated the Fourth Amendment by entering the room and securing Milikan and Benge, or by quickly inspecting the bathroom and adjoining room. At the point they entered, the officers had probable cause to believe that criminal activity was occurring, and exigent circumstances existed in the need to ensure the officers' safety. *See Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S.Ct. 2458, 2459 (2002).

Admittedly, the question of exigent circumstances is a close one. Where officers' actions indicate they have a reasonable belief that a crime is being committed, for example by having been engaged in surveillance, having information from reliable sources, calling in a SWAT team, or by approaching in tactical formation or with weapons drawn, a court is likely to find the exigency was created by the officers. *See Vega*, 221 F.3d at 798-800 (5th Cir. 2000). As noted above, that was not the situation here. The court therefore concludes that Milikan's rights were not violated by the entry into the room, nor by the protective sweep.

## Is the Methamphetamine or the Key in Milikan's Pockets Admissible?[5]

**Dickerson Patdown Theory**

Lt. Lowrie testified that the first thing he did after obtaining Arnett's consent to search the room was take Milikan out of the room and pat him down. Such a search is permitted without a warrant, but is limited to that which is necessary to protect the officer from a hidden weapon.

---

[5] Since the methamphetamine, marihuana, and counterfeit currency discovered in the room were not suppressed, the suppression of the three grams in Milikan's pocket may have little effect on a determination of guilt or innocence or, if convicted, on any sentence.

*Minnesota v. Dickerson*, 508 U.S. 366, 373, 113 S.Ct. 2130, 2136 (1993). If the officer determines from this patdown or "feel" that there is probable cause to believe a nonthreatening item is illegal contraband, seizure is lawful. 508 U.S. at 376, 113 S.Ct. at 2137. Of course, since this is an exception to the warrant requirement of the Fourth Amendment, the burden of proof is on the Government.

Lt. Lowrie said he felt "a small lump" in Milikan's pocket, and that it "was immediately apparent to me that it was going to be some type of narcotic." Unfortunately, Lt. Lowrie gave no details which might distinguish the lump from lawful items such as tobacco or candy. While hard compact packages taped to ankles are unusual, *see United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994), a lump in a man's pocket is not.

The court was evidently supposed to rely solely upon Lt. Lowrie's experience and accept his conclusory statements. However, in addition to not giving much of a description of the item in the pocket, Lt. Lowrie never testified about how many pat down searches he had conducted, nor what actual training he had in distinguishing between legal and illegal items in a pocket. Also telling is the fact that when he felt the "small lump" which was "immediately apparent" as "some type of narcotic," Lt. Lowrie asked "what was this" and "how much it was going to be." If he knew, why did he ask?

The Government simply failed to meet its burden of proof. The Lieutenant's unsupported, conclusory statement is not credible enough, nor sufficient for the court to find it more likely than not that the incriminating nature of the lump was apparent so as to give probable cause for its

seizure.[6] Lt. Lowrie did not find the key to the case during the patdown so it need not be considered at this point.

**Milikan's Statements About the Methamphetamine and Key**

The next question is whether officers were allowed to question Milikan about the lump in his pocket, or the key without informing him of his right to be silent. Three officers had suddenly burst into Milikan's motel room, placed him on the ground, handcuffed him, and forced him from his motel room (his house for Fourth Amendment analysis) onto a balcony. He was first questioned while an officer's hand was exploring his pockets and thighs.

The court finds that Milikan was in custody for *Miranda* purposes. *See Stansbury v. California*, 511 U.S. 318, 322-23, 114 S.Ct. 1526, 1529 (1994) (determination of custodial status depends on objective circumstances of interrogation, not on subjective views of officer). Whether Lt. Lowrie believed that Milikan had committed a crime is not pertinent to the question of custodial status. However, and this could have been more clearly expressed by the court at the hearing, whether the officer is addressing the suspect, and asks him a question intended to elicit an incriminating response, may be considered in determining whether the statement is voluntary or is the result of interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689 (1980).

Lt. Lowrie specifically asked Milikan what the lump was and how much it was. The court finds these were questions intended to elicit an incriminating response. Since Milikan was in custody, and had not been informed of his right to remain silent, his responses are not admissible.

---

[6]The fact that the lump turned out to be methamphetamine is no answer. "We found dope" is not an exception to the protection Americans are privileged to enjoy under the Fourth Amendment.

Lt. Lowrie said that he found a locked case in the room and instructed Deputy Dubose to "ask the two male subjects where the key was." Deputy Dubose testified that the Lieutenant's question was directed to Milikan, Benge, and himself, and that he, Dubose, did not inform either man of his rights. Milikan responded that he had the key, so Deputy Dubose retrieved it from his pocket. As noted above, Milikan was in custody. Lt. Lowrie thought there was a firearm in the case, so the question was asked to elicit an incriminating response. Milikan's statement that he had the key is not admissible.

### The Rifle in the Locked Case

When the door opened the officers saw a case, which they thought was a gun case. As discussed above, this was enough, when combined with the tip and the sight of Benge retreating into the bathroom, to enter the room. However, once Benge and Milikan were handcuffed, and under guard on the balcony, exigent circumstances no longer existed. There was plenty of time to obtain a warrant - the case wasn't going anywhere, and the officers testified that magistrates were readily available. The Government relies upon the plain view exception to justify opening the locked case without consent or a warrant

A legitimate expectation of privacy is manifested by an individual who places an item in a locked, opaque container that conceals its contents from view. *United States v. Ross*, 456 U.S. 798, 822, 23, 102 S.Ct. 2157, 2172 (1982). There is an exception when the case is obviously a gun case. *See United States v. Villarreal*, 963 F.2d 770, 775-76 (5th Cir. 1992) (noting that the logic of *Arkansas v. Sanders*, 442 U.S. 753, 764, 99 S.Ct. 2586, 2593, n.13 survives the subsequent overruling of that case).

An example of such obviousness is found where the case had the label "GUN GUARD." *See United States v. Meada*, 408 F.3d 14, 23 (1st Cir. 2005).  A similar label, the logo of a firearm manufacturer, or a case with the distinctive shape of a firearm might also bring a locked case under the plain view exception.  The burden is on the Government to provide sufficient evidence of the appearance of the case.

Lt. Lowrie first testified that he saw a "silver gun case."   Later he said he knew it was a gun case because he had hunted all of his life and had been "in and out of Wal-Mart, Academy, several stores, sporting good stores that sell these type of gun cases."   At this point no evidence had been offered to distinguish the appearance of this case from that of any number of cases.   Therefore the court asked "am I going to get a description of this case other than that?  Is there going to be a photograph or something?"

This elicited the information that "It's a rifle size gun case.  It's like a silver color, chrome color, real bright finish and it's a hard –it's a hard case with a locking mechanism on it."  The problem is that a "rifle size" case made for two rifles or shotguns is about the same length and width as a case for an electric guitar. Narrower cases are sold to transport expensive fishing rods and certain musical instruments.  The court acknowledges that one might be able to distinguish between such cases, especially on the basis of depth and weight, if such evidence was provided.  Alternatively, a photograph, or an examination of the case itself, might suffice.  The court need not decide that issue, since the Government declined the court's invitation to completely describe the case. The court does not find Lt. Lowrie's testimony about hunting and frequenting sporting goods stores sufficient to establish his expertise to the point that his bald assertion is credible enough to show, by a preponderance of the evidence, that this was a gun case.

9

There is insufficient evidence that Arnett had any control over, or ownership interest in the case, or any authority to consent to a search of Milikan's locked case. She did not even know where the key was. The court has already discussed the reasons that the seizure of the key from Milikan was the result of improper interrogation. The Government has failed to present evidence to support its claimed exceptions to the warrant requirement. The rifle is not admissible under the *Sanders* "plain view" exception.

**Inevitable Discovery Theory**

The government also claims that an inventory search would have led to the "inevitable discovery" of the methamphetamine and key in Milikan's pocket and the rifle in the case. The Government has the burden to prove both:

> 1. A reasonable probability that the contested evidence would have be discovered by lawful means in the absence of police misconduct; and

> 2. That the Government was actively pursuing a 'substantial alternate line of investigation at the time of the constitutional violation.'

*United States v. Kirk*, 111 F.3d 390, 392 (5th Cir. 1997).

As to the contents of Milikan's pockets, the Government made a start on meeting its burden. Lt. Lowrie was asked:

> Q. Now, once **an individual** is under arrest, what is the **normal policy** when you arrest him? Do you conduct an inventory of the person or the person's personal belongings? What do you **normally** do? (emphasis added)

> A. Yes. Before he's placed in the patrol vehicle, everything is gone through as far as his shoes and his pockets and everything to make sure there is no other contraband that he could smuggle into the patrol car and possibly further smuggle into the correctional facility.

This a general response to a general question. There was no followup to establish that such a policy

was followed in this case - that Milikan was searched. There was no testimony that this was a "normal" search or arrest. To the contrary, the circumstances seem somewhat out of the ordinary, given that the Government must rely upon exceptions to the Fourth Amendment for every piece of evidence recovered, to say nothing of the initial entry.

There was no statement that the search Lt. Lowrie described was the routine practice of the organization, or of Lt. Lowrie, or was some other officer's personal practice. The court does not accept this bare statement alone, in response to a leading question months after the event, as establishing, by a preponderance of the evidence, a habit of an organization or an individual under Fed. R. Evid. 406.

Also telling is the fact that if an inventory search had been done, it would have been so easy to prove. The Government would have submitted a copy of the jail inventory sheet, prepared when Milikan was booked into the jail. Alternatively one of the three officers who testified would have, at least briefly, described the inventory search of Milikan. There was no mention at all of an inventory of the room. The Government failed to meet its burden of proving that the evidence in question would have been discovered by lawful means.

Additionally the Government has presented no evidence that it was actively pursuing a "substantial alternate line of investigation at the time of the constitutional violation." As noted there was no evidence that an inventory search was actually conducted. The officers agreed that magistrates were easily available to issue warrants, yet no application had been made. Contact with the Defendants was initiated on a tip of questionable reliability, and exploded into an actual investigation because of rapidly unfolding exigent circumstances. There were no other

investigations being conducted. The inevitable discovery exception does not render the rifle, or the contents of Milikan's pockets, admissible.

## CONCLUSION

It is therefore **ORDERED**, for the reasons stated above, that while the motion to suppress all of the evidence on the basis of the warrantless entry into the room or the protective sweep, is **DENIED**, the motion to suppress the rifle, the contents of Defendant Milikan's pockets, and the referenced statements made by defendant Milikan at the motel is **GRANTED**.

It is further **ORDERED**, for the reasons stated on the record, that the motion to suppress the methamphetamine discovered in the room, the drug paraphernalia, the marihuana, the receipts, the counterfeit currency, the videotaped statement at the station, and the written confession is **DENIED**.

So **ORDERED** and **SIGNED** this **19** day of **December, 2005.**

_____
Ron Clark, United States District Judge